# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| NATIVE AMERICAN ARTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 08 C 3908 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| PETER STONE CO., U.S.A., INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Native American Arts ("NAA") is suing Peter Stone Company ("Stone") under the Indian Arts and Crafts Act ("IACA"), 25 U.S.C. § 305, *et seq*., which forbids selling merchandise "in a manner that falsely suggests it is Indian produced, an Indian product, or the product of a particular Indian or Indian tribe or Indian arts and crafts organization....." § 305e(a). *See Native American Arts, Inc. v. Waldron Corp*., 399 F.3d 871 (7th Cir. 2005). The purpose of the Act is to protect consumers and the makers of authentic Native American goods from false representations of a product's "origin or authenticity." See 68 Fed.Reg. 35164 (describing the Indian Arts and Crafts Act as "essentially a truth-in-marketing law designed to prevent, through both civil and criminal sanctions, marketing of products in a manner that falsely suggests such products are produced by Indians when the products are not, in fact, made by an Indian as defined by the 1990 Act."). *See Native American Arts, Inc. v. Hartford Cas. Ins. Co.,* 435 F.3d 729, 733 (7th Cir. 2006); *Waldron Corp., supra*.

The Act authorizes suit by an aggrieved Indian, Indian tribe, or Indian arts and crafts organization. §305e(b) and(d). A successful plaintiff may recover the greater of treble damages, including any and all gross profits accrued by the defendant as a result of its prohibited activities,

or "in the case of each aggrieved individual Indian, Indian tribe, or Indian arts and crafts organization, not less than $1,000 for each day on which the offer or display for sale or sale continues." §3053(b)(2)(A);(B). *See generally* Fern L. Kletter, Validity, Construction, and Application Indian Arts and Crafts Act of 1990, Indian Arts and Crafts Enforcement Act of 2000, and Indian Arts and Crafts Amendments Act of 2010, 62 A.L.R. Fed.2d 63 (2012).[1]

In its initial Rule 26 disclosures, NAA sought $5,000 in "estimated damages... based on competitive injuries, including Defendant's gross profits on violative products sold." [Dkt. 249-24 ¶3]. There was no further explanation for this figure, and no documents were offered to support it notwithstanding the specific strictures of Rule 26. $14,235,000 was sought in estimated statutory damages. *Id.* It was not until the summary judgment briefing that the claimed statutory damages escalated to $36,144,000. [Dkt. #295-2, ¶79]. These figures were based on the defendant's purportedly unlawful gross sales of $26,000 in goods over a two year period.

Stone has filed a motion for summary judgment, arguing that NAA has not established that it has standing to sue under Article III of the Constitution.

## I.

### A.

### BASIC SUMMARY JUDGMENT PRINCIPLES

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In a summary judgment proceeding, a court may not weigh the evidence or decide which inferences

---

[1] Throughout this Opinion we use, as have other courts, the language of the statute, which uses the term "Indian" rather than "Native American." *Ho-Chunk Nation v. Nature's Gifts, Inc.*, 1999 WL 169319 n.1 (N.D.Ill. 1999).

should be drawn from the facts. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Still, "a factual dispute is 'genuine' only if a reasonable jury could find for either party." *Rosario v. Brawn*, 670 F.3d 816, 820 (7th Cir. 2012). To survive summary judgment, a non-moving party must "show through specific evidence that a triable issue of fact remains on issues for which the nonmovant bears the burden of proof at trial." *Knight v. Wiseman*, 590 F.3d 458, 463-64 (7th Cir. 2009). The evidence the nonmovant submits in support of his position must be "sufficiently strong" that a jury could reasonably find for the nonmovant. *Id.*

## B.

### SUMMARY JUDGMENT UNDER LOCAL RULE 56.1

As always, the facts underlying this summary judgment proceeding are drawn from the parties' Local Rule 56.1 submissions. "For litigants appearing in the Northern District of Illinois, the Rule 56.1 statement is a critical and required component of a litigant's response to a motion for summary judgment." *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 398 (7th Cir. 2012). Local Rule 56.1 requires a party seeking summary judgment to include with its motion "a statement of material facts as to which the ... party contends there is no genuine issue and that entitle the ... party to a judgment as a matter of law." Local Rule 56.1(a)(3); *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008). Each paragraph must refer to the "affidavits, parts of the record, and other supporting materials" that substantiate the asserted facts. Local Rule 56.1(a)(3); *F.T.C. v. Bay Area Business Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005).

The party opposing summary judgment must then respond to the movant's statement of proposed material facts; that response must contain both "a response to each numbered paragraph

in the moving party's statement," Local Rule 56.1(b)(3)(B), and a separate statement "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment." Local Rule 56.1(b)(3)(C); *Ciomber*, 527 F.3d at 643. Again, each response, and each asserted fact, must be supported with a reference to the record. Local Rule 56.1(b)(3)(B); *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009); *Bay Area Business Council, Inc.*, 423 F.3d at 633.

The district court is entitled to enforce strict compliance with its local rules regarding summary judgment motions. *Townsend v. Alexian Bros. Medical Center,* 589 Fed.Appx. 338, 339 (7th Cir.2015). The obligations set forth by a court's local rules are not mere formalities. *Delapaz v. Richardson,* 634 F.3d 895, 899 (7th Cir.2011)."If parties fail to comply with local rules, they 'must suffer the consequences, harsh or not.'" *Petty v. City of Chicago,* 754 F.3d 416, 420 (7th Cir.2014). The Seventh Circuit has "consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment." *Id. See also Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 648-649 (7th Cir.2014); *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 537 (7th Cir. 2011). Responses and facts that are not set out and appropriately supported in an opponent's Rule 56.1 response will not be considered. *Shaffer v. American Medical Association*, 662 F.3d 439, 442 (7th Cir. 2011); *Bay Area Business Council*, 423 F.3d at 633. Consequently, the movant's properly supported facts will be deemed admitted. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013).

## II.

## FACTUAL BACKGROUND

NAA is an "Indian Arts and Crafts Organization," owned by Matthew and Mary Mullen, who

are enrolled members of the Ho-Chunk Nation.[2]  The Mullens sell Indian craft items, ranging from

dream catchers and pottery to jewelry to figurines and beyond.[3]  They operate a store in Tinley Park,

Illinois, and also sell items through a website called "catchyourdreams.com."  NAA has been in

business for nearly 20 years [Dkt. #279-1, ¶90; #298-2, ¶¶ 4-7], and, in that time has,  according to

Mr. Mullen, garnered $1.25 million in revenue from the sale of Native American arts and crafts.

[Dkt.#279-1, ¶94; # 298-2, ¶ 16].   Apart from this statement, there is no proof in the form of any

business records that have been offered into evidence.  Indeed, there is no evidence on this record

that NAA even maintain business records – and the citation provided to support the figure has

nothing to do with revenues; it says conclusorily that NAA has a significant web presence – whatever

_____

[2] Formerly, the IACA defined "Indian Arts and Crafts Organization" as "any legally established arts and crafts marketing organization composed of members of Indian tribes."  25 U.S.C. §305e(d)(4)(1990). *Native American Arts, Inc. v. Aquino*,  2004 WL 2434260, 1 (N.D.Ill. 2004). This definition no longer appears in 25 U.S.C. §305e, which contains, among other things, general definitions and prescribes the measure of damages in the event of a violation of the Act. Section 305e(B)(iii), does, however, contain the term, "Indian arts and crafts organization," but does not define it. However, the same definition that appeared in 305e is now found at §305a, which is titled "Promotion of economic welfare through development of arts and crafts; powers of [the Indian Arts and Crafts] Board." The Board is "a small office in the Department of Interior...." *Waldron Corp*., 399 F.3d at 874.

The Act provides that the Secretary of the Interior, through the Board, is to promote the economic welfare of the Indian tribes and Indian individuals through the development of Indian arts and crafts and the expansion of the market for products of Indian art and craftsmanship. The Section concludes:  "For the purposes of this section, the term "Indian arts and crafts organization" means any legally established arts and crafts marketing organization composed of members of Indian tribes."  It is a fundamental principal of statutory construction that the same words used in different sections of the same statute are to be given the same meaning and effect. *United Sav. Assoc. v. Timbers of Inwood Forest Assocs.,* 484 U.S. 365, 371 (1988).

[3] Although the Mullens are members of the Ho-Chunk Nation, the featured products on the NAA website are, in the main, Navajo products. The Navajo are a distinctly different people from the Ho-Chunk, with a distinctly different, and well-known, arts and crafts tradition.  *See generally, Navajo Nation v. Urban Outfitters, Inc.*, 935 F.Supp.2d 1147 (D.N.M. 2013). There are also offered for sale items for Easter, Christmas, and Valentine's Day.

that may mean. [Dkt. # 279-1, ¶ 94; Pl.Ex. 1, ("Mullen Dec."), ¶ 26].[4]

Crediting Mr. Mullen's unsupported assertion, NAA's gross receipts come to less than $70,000 a year. NAA's profits, if any, are anyone's guess – again there are no records, but the numbers cannot be too impressive. Mr. Mullen claims that in the 18 years NAA has been in business, it has spent $52,000 in advertising – which averages about $2800 a year. This represents about 4% of NAA's sales. NAA calls that outlay "substantial." [Dkt. # 279-1, ¶ 102]. But that is an opinion, not a fact admissible in summary judgment. Moreover, experts in the field have recommended that small businesses spend 10-12% of their sales times their markup (which is 100%, *see infra* below), minus rent. http://www.entrepreneur.com/article/54436. We don't know what NAA's rent is, as there are no financial records, and Mr. Mullen does not say what it is. But the before-rent recommended figure would be $7,000 to $8,400 annually, or almost three times the amount NAA spends.

Mr. Mullen also claims that NAA has spent $25,000 on its website, or about $1400 a year. There is no claim there was either an upward or downward adjustment following the defendant's sale of its products and no proof that its sales have, in fact, diminished. This does not seem particularly "substantial." (Pl.Ex. 1. ¶33). NAA states that it employs artists from Indian Tribes, but does not say how much their salaries are or how many. [Dkt. # 279-1, ¶ 103]. Also, according to Mr. Mullen, NAA marks up every item it purchases from a Native American artisan once; that is, an item that costs NAA $20 is sold for $40. (Pl.Ex. 1, ¶ 78). Then there is the rent on NAA's brick and mortar store. It's mostly guesswork in the absence of business records, but NAA's annual profit would

---

[4] This is not to say that we are not crediting for purposes of summary judgment Mr. Mullen's otherwise uncorroborated factual representation in his Declaration. We are crediting it.

seem to not exceed $30,000 per annum. The statutory damages NAA wants from Stone – over $36 million, representing an amount that NAA would be unable to generate in gross revenues over the course of more than two centuries. If we are talking about profits, it would take NAA half a millennium to reach that lofty summit based on past performance.

What did Stone do to warrant this?  In 2006, it began selling jewelry designed by Wendy Whiteman, which she called the "Wolfwalker" Collection.  On its website, Stone advertised these items as "Authentic Native American Jewelry," "Native American Jewelry," "Native American Designs," or "Genuine Indian Handmade." [Dkt. # 279-1, ¶¶ 98, 107].  But it's not clear whether Wendy Whiteman qualifies as an Indian – a member of an Indian Tribe or certified as an Indian artisan by an Indian Tribe – under the IACA. §305e(a)(1). NAA claims she is not [Dkt. # 279-1, ¶ 111], but the evidence it cites to – deposition testimony from Ms. Whiteman and Stone's owner, Peter Koslowski – does not support its assertion.

At her deposition, Ms. Whiteman was asked why she used the "Wolfwalker" name, and she said it's because her "*spiritual roots* are Native American." (Pl. Ex. 4 (Whiteman Dep.), at 12)(Emphasis supplied). That statement is not proof that she is not an "Indian." To the contrary, having spiritual roots of a Native American is perfectly consistent with being one.  Mr. Mullen's contrary conclusion is conjecture, not proof.  She was then asked whether she is an "enrolled member of a recognized Indian tribe," to which she responded that she is not.  (Whiteman Dep., at 15).  But, the word "enrolled" does not appear in the IACA. So if NAA is relying on Ms. Whiteman not being an *enrolled* member of a tribe, its case rests on flimsy footing based on the record so far. Significantly, Ms. Whiteman was never asked if she was an Indian/Native American.

To be sure, Tribal enrollment is a common evidentiary means of establishing Indian status, but it is not the only means, and it is certainly not necessarily determinative. *United States v. Bruce*, 394 F.3d 1215, 1224 (9th Cir. 2005). This isn't an argument that Stone raises here, but we must bring it up because NAA, in responding to a motion for summary judgment, is expected to strictly comply with Local Rule 56.1. That means its asserted facts must be supported by specific references to evidence in the record. *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004). NAA has clearly missed that mark here.

According to NAA, Peter Koslowski didn't know any better, saying "she gave [him] every indication that she was a Native American to the heart and soul." [Dkt. # 279-1, ¶ 111]. Ms. Whiteman told him she could provide him with "an authentic or a line of Native American jewelry created by a Native American." (Pl. Ex. 8 (Koslowski Dep., at 33)). So, as far as Mr. Koslowski knew, he was offering such a product. (It is unclear what purpose NAA offers this evidence for, but it does not support the proposition that Ms. Whiteman was not an "Indian").

NAA claims that, at his deposition, Mr. Koslowski "admitted" that he violated the IACA by selling counterfeit Indian jewelry [Dkt. # 279-1, ¶ 110]; but, again, the evidence NAA cites does not support its assertion. While NAA relies on testimony from Mr. Koslowski's deposition, nowhere in the cited pages does he admit that he violated the Act. In fact, Mr. Koslowski testified that "when [he] speak[s] with Wendy Whiteman, [he's] talking to a Native American." (Koslowski Dep., at 57). That's the opposite of conceding a violation of the IACA. The assertion being unsupported is also a violation of the Local Rule.

In any event, Stone offered the Wolfwalker line from 2006 through 2009. In those four years, total sales came to $27,905.09. [Dkt. # 279-1, ¶ 32]. Over that time period, the product line constituted less than 3/10 of one percent of Stone's sales, which were nearly $10 million. [Dkt. # 279-1, ¶¶ 16, 32, 33]. The line was clearly a minuscule portion of Stone's business, which concentrates on Celtic and New Age designs. [Dkt. # 279-1, ¶ 22]. Yet, NAA denies that the Wolfwalker collection was a "very small amount and percentage of Peter Stone's sales." [Dkt. # 270-1, ¶ 32]. NAA can offer no support for this denial, of course, and it is rather unpersuasive to argue that 3 cents out of every $10 is not a very small percentage.

Stone is a wholesaler; less than 2% of its sales are to end users. [Dkt. #279-1, ¶ 9]. It has little or no presence in Illinois. Mr. Koslowski has attended two trade shows here, a gift show and a Celtic and Irish jewelry show in January 2006 and September 2006, respectively. [Dkt. # 279-1, ¶ 13]. Stone has a website, www.peterstone.com, but between 2006 and 2009, the internet accounted for less than 1% of its sales. [Dkt. # 279-1, ¶ 17]. Less than 4% of Stone's customers are in Illinois. Of these, Mr. Mullen claims just two are NAA's competitors: Buffalo Gal Home Gallery in Frankfort, Illinois, and Sanctuary Traders in Tinley Park. (Mullen Dec., ¶ 89).[5] But there is no evidence that any of Stone's sales to these two businesses were of Wolfwalker items.

Mr. Mullen estimates that he became aware of Stone in 2006 or 2007. He says he received a direct mailing from Stone that depicted the Wolfwalker line. [Dkt. # 279-1, ¶ 43]. He made a

---

[5] NAA's statement of facts cites to paragraph 91 of Mr. Mullen's declaration as supporting this claim. That paragraph merely states that NAA filed suit on July 8, 2008. [Dkt. #279-1, ¶ 25; Pl.Ex. 1, ¶ 91]. It's yet another violation of Local Rule 56.1 but, even taking NAA at its word, the fact that two of its customers also appear on Stone's customer list is essentially meaningless if there is no evidence that those two stores purchased and sold Wolfwalker jewelry.

purchase from Stone in January 2007; he didn't intend to sell them at his store, he wanted to assess them. [Dkt. # 279-1, ¶ 45; Mullen Dep., at 25]. He received them on January 13, 2007, (Pl.Ex. 1 ("Mullen Dec.") ¶ 57), and he says it was readily apparent to him that they were mass-produced, and the bag for each item had a sticker that said "Made in Thailand." (Mullen Dec., ¶ 59). He made another purchase in May 2008, with similar results. (Mullen Dec., ¶ 62, 63).

Shortly thereafter, in July 2008, NAA filed suit. It was not, as the saying goes, NAA's first rodeo. In the Northern District of Illinois alone, NAA has filed at least 125 such cases. *See Native American Arts, Inc. v. Contract Specialties, Inc.*, 754 F.Supp.2d 386, 389 (D.R.I.2010); https://ecf.ilnd.circ7.dcn/cgi-bin/iquery.pl?574960696153658-L_1_1-0-435980-pty-pla%20%20%20%20%20%20%20-plaintiff (106 cases); https://ecf.ilnd.circ7.dcn/cgi-bin/iquery.pl?966230440793572-L_1_1-0-649156-pty-pla%20%20%20%20%20%20%20-plaintiff (7 cases); https://ecf.ilnd.circ7.dcn/cgi-bin/iquery.pl?966230440793572-L_1_1-0-461174-pty-pla%20%20%20%20%20%20%20-plaintiff (5 cases); https://ecf.ilnd.circ7.dcn/cgi-bin/iquery.pl?966230440793572-L_1_1-0-550255-pty-pla%20%20%20%20%20%20%20-plaintiff (7 cases). Most seem to be short-lived and dismissed pursuant to settlement. The amounts, of course, are confidential but, in at least one case against JC Penney, NAA garnered a settlement of over $1 million. *Flodine v. State Farm Ins. Co.*, 2003 WL 1394977, 2 (N.D.Ill. 2003). In the context of one of these cases, the Tribal Court of the Ho-Chunk Nation commented that NAA was "mainly concerned with monetary gains," was "utilizing the [IACA] without any research," and that "dollar amounts of $1,000 per day and $2,000,000 [were] preposterous and frivolous." [Dkt. # 249-14; Def.Ex. D-1]. By not raising any hearsay (or other) objection it might have had, the plaintiff

has waived any evidentiary issue. *See Schatz v. McCaughtry* 87 F.3d 13161996 WL 326015, 3 (7th Cir.1996); *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wisconsin, Inc.*, 991 F.2d 1249, 1259 (7th Cir.1993); *Lewis v. Tripp*, 604 F.3d 1221, 1228 n.4 (10th Cir. 2010)).

Still, there is nothing inherently wrong with a zealous private attorney general. *Murray v. GMAC Mortg.Corp.*, 434 F.3d 948, 954 (7th Cir. 2006). And certainly, in view of the absence of governmental enforcement in the first 60 years of the statute's existence, H.R. Rep. No. 101–400(I), at 4–5 (1990); *Hartford Cas. Ins. Co.,*435 F.3d at 731; *Waldron Corp., supra.*,[6] if any statute ever needed a boost in terms of enforcement, it's the IACA.[7] The fact remains that NAA is not an actual attorney general, and it still must prove it has Article III standing to sue.

### III.
### ANALYSIS
### A.

Stone begins by arguing that, under the doctrine of issue preclusion, NAA is precluded from

---

[6]Although the Indian Arts and Crafts Act dates back to 1935, *Waldron Corp.* was the first reported appellate case under it. Until 1990, the only sanction for violating the false-advertising provision was criminal, and there were no prosecutions—"zero," to use Judge Posner's description in *Waldron Corp*. There had been some suits under the amended statute, but none until *Waldron Corp*. that got beyond the district court level. 399 F.3d at 873.

[7] Thus, the Act was amended in 2000 to, among other things, confer standing to sue on Indian Arts and Crafts Organizations. See 25 U.S.C. § 305e(c)(1)(C); S.Rep. No. 106–452, at 4 (2000). As the Report noted: "To date, there has not been a successful prosecution under the IACA. One of [the] obstacles in enforcing the IACA has been the lack of suits initiated by either the Attorney General and [sic] individual Indian tribes. Often these entities are not aggressive in bringing suits on behalf of individual artisans and/or artisan organizations because the Attorney General or an Indian tribe suffer no direct injury. Individual Indian artisans and artisan organizations suffer both financial and cultural injury from inauthentic Indian arts and crafts entering the market. By broadening standing under the statute, the Committee's intent is to encourage greater enforcement of the Act.").

trying to establish standing. Issue preclusion being an affirmative defense, Stone has the burden of establishing its applicability. *E.E.O.C. v. AutoZone, Inc*., 707 F.3d 824, 831-32 (7ᵗʰ Cir. 2013); *Simpson v. Nickel*, 450 F.3d 303, 306 (7ᵗʰ Cir. 2006). To do so, Stone must show that:

> (1) the issue sought to be precluded must be the same as that involved in the prior litigation, (2) the issue must have been actually litigated, (3) the determination of the issue must have been essential to the final judgment, and (4) the party against whom estoppel is invoked must be fully represented in the prior action.

*AutoZone*, 707 F.3d at 831.

Stone relies on Judge Kocoras's grant of summary judgment to the defendant in *Native American Arts, Inc. v. Indio Products, Inc.*, [No. 06 C 4690, Memorandum Opinion of 10/4/11], which held that NAA had no standing to sue Indio because it had not proven that it suffered any injury in fact that was caused by Indio. [Dkt. # 249-19, at 9, 11, Ex. 6 Memorandum Opinion].[8] The ruling was based on the court's assessment of the evidentiary support – or lack thereof – that NAA managed to muster to establish its injury. [Dkt. # 249-19, at 9, 10-11]. Stone asserts that the allegations in this case are virtually the same, that the issue of standing was actually litigated, that the determination of standing was necessary to the outcome in *Indio*, and that NAA was a party in that case. [Dkt. # 250, at 13]. But Stone goes no further than that.

These are assertions, not principled, supported arguments. Stone provides no discussion demonstrating that the issue it seeks to have precluded here is the same as that presented in *Indio*. What was the evidence of injury presented in *Indio*? What was the evidence of causation? How does it compare to the evidence here? Stone leaves such questions unanswered [Dkt. #250, at 12-

---

[8] Throughout the remainder of this opinion, references to Judge Kocoras's opinion will be to Exhibit 6 in support of the defendant's motion for summary judgment in the instant case.

13], and we may not flesh out arguments on a party's behalf. *See, Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010); *Weissman v. Weener,* 12 F.3d 84, 86 (7th Cir.1993*); Burdett v. Miller,* 957 F.2d 1375, 1380 (7th Cir.1992)*.* And where, as here, a party 's presentation is undeveloped and unsupported, the arguments are deemed waived. *See Pine Top Receivables of Illinois, LLC v. Banco de Seguros del Estado*, 771 F.3d 980, 987 (7th Cir. 2014*); Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 648 (7th Cir. 2014); *Aida Food and Liquor, Inc. v. City of Chicago,* 439 F.3d 397, 402 (7th Cir.2006).

But even if Stone had presented a developed argument in support of its issue preclusion defense, it wouldn't have mattered. As already noted, Judge Kocoras's ruling was based on the evidence presented in his case – evidence that was specific to Indio Products. The evidence regarding the defendant here is necessarily different. It would be another matter entirely if Judge Kocoras's standing decision were based on evidence that NAA did not qualify as an Indian arts and crafts organization under the IACA. *See* 25 U.S.C. §305e(d)(1)(D). If NAA had the opportunity to litigate that issue in *Indio* and lost, it might have been precluded from taking a second crack at it here. But that did not happen. In the end, then, *Indio* does not preclude NAA from litigating the standing issue here. It is simply a case that Stone can assert aids the general analysis here and is as a good one to follow, even though not binding.

**B.**

Stone next argues that NAA has no standing to sue because it is not an Indian Arts and Crafts Organization under the IACA. Stone does not point to any necessary requirements that NAA does not meet, but seems to rely on the assertion that there is no case stating that NAA is an Indian Arts and Crafts Organization under the IACA. [Dkt. # 250, at 14]. Apart from being irrelevant, that's not

quite true. There are several opinions that say precisely that. *See, e.g., Native American Arts, Inc. v. Aquino*, 2004 WL 2434260, 1 (N.D.Ill. 2004); *Native American Arts, Inc. v. Bundy-Howard, Inc*., 168 F.Supp.2d 905, 908-09 (N.D.Ill. 2001); *Ho-Chunk ex rel. Native American Arts, Inc. v. Nature's Gifts, Inc*., 1999 WL 169319, 1 (N.D.Ill. 1999); *Native American Arts, Inc. v. Moon Raven Intern., Inc*., 1998 WL 325245, 1 (N.D.Ill. 1998).

If Stone means that the issue has never been *litigated* to a final holding that NAA is an Indian Arts and Crafts Organization, that is true. The statements in the above cases that NAA is an Indian Arts and Crafts Organization were made in the preliminary phase of the cases, and the question was not raised and thus did not have to be resolved. But that is analytically inconsequential. Supposing this were the first case brought by NAA. That obviously would not preclude NAA from proceeding and prevailing in this case, if it had the necessary proof.

Stone cites no case holding NAA is *not* an Indian Arts and Crafts Organization. The only scrap of evidence Stone cites to is the March 2007 letter from the Ho-Chunk Nation court to the Ho-Chunk Nation legislature in which the court opined that NAA is mostly concerned with monetary gain and hadn't done its research prior to suing the Ecuadorian Indians in the *Maigua* case (N.D.Ill. 07-361) because they were, indeed, Indians as much as the Ho-Chunk Nation. Notably, the letter does not say that NAA was not an Indian Arts and Crafts Organization or that it had no standing to sue under the IACA. [Dkt. #249-14]. It is a commentary on NAA's perceived lack of morality and claimed avarice, which are matters that are irrelevant for purposes of summary judgment.

Also, Judge Guzman – the judge in *Maigua* – rejected the notion that marketing Indian arts and crafts had to be the *primary* purpose of an Indian Arts and Crafts Organization for it to qualify

as such under the Act.  N.D.Ill. 07-361, Dkt. # 34, at 3-4. That holding is consistent with the text and purpose of the Act, which are to promote the very commercialism and economic development that Stone finds offensive and invokes to depreciate NAA's claim.

## C.

We turn then to that aspect of the summary judgment motion that raises the issue of Article III standing.  Article III standing is a jurisdictional requirement, and, whether raised by the defendant or not, the court is under an independent obligation to examine it.  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230–31 (1990); *Kochert v. Greater Lafayette Health Services, Inc.*, 463 F.3d 710, 714 (7th Cir. 2006).  There are three elements to standing, "an essential and unchanging part of the case-or-controversy requirement of Article III," and the plaintiff must establish each of them.  *Lexmark Intern., Inc. v. Static Control Components, Inc.*, – U.S. –, –, 134 S.Ct. 1377, 1386 (2014).  *See also*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014)(these three elements are "the   irreducible constitutional minimum of standing"); *Association of American Physicians and Surgeons, Inc. v. Koskinen*, 768 F.3d 640, 642 (7th Cir. 2014).

First, the plaintiff must have suffered an "injury in fact"—that is, "an invasion of a legally protected interest, which is (a) concrete and particularized – particularized meaning the injury must affect the plaintiff in a personal and individual way – and (b) is actual or imminent, not conjectural or hypothetical. Second,  the injury must be fairly traceable to the challenged action of the defendant. And third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61;  *Sterk*,  770 F.3d at 623; *Koskinen*, 768 F.3d at 642.

"'An organization has standing to sue if (1) at least one of its members would otherwise have standing; (2) the interests at stake in the litigation are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires an individual member's participation in the lawsuit.'" *Sierra Club v. U.S. E.P.A.,* 774 F.3d 383, 388 (7ᵗʰ Cir.2014).[9]

## D.

To prove Article III injury in fact, the NAA wagers all on the claims of its owner, Matthew Mullen, that it has suffered "(a) reputation and good will loss to its business by having to deal with customer mistrust caused by the deceptive practices engaged in by Peter Stone and other wrongdoers who violate the IACA; (b) diminution in value to the congressionally granted designation of origin in genuine or authentic Native American arts and crafts that NAA uses and relies upon to promote its business and make a livelihood; and (c) misappropriation of NAA's advertising and promotional investment in genuine Native American arts and crafts due to Peter Stone free riding on those efforts." [Dkt. # 279, at 18; Dkt. # 279-1; ¶ 108].[10]  But these are nothing more than a restatement

---

[9] In *American Bottom Conservancy v. U.S. Army Corps. Of Engineers*, 650 F.3d 652, 655 (7ᵗʰ Cir. 2011)(Posner, J.),the court concluded that some of the most frequently mentioned grounds for the constitutional doctrine of standing are "tenuous," and that the "solidest grounds" for the doctrine are "practical." They include the need to prevent the federal courts from being overwhelmed by cases and to ensure that the legal remedies of primary victims of wrongful conduct will not be usurped by persons trivially or not at all harmed by the wrong complained of. *Id*. at 656.

[10] In other cases, NAA has at least promised that it would in the future offer expert testimony on the fact of damages. *See Speciality Merchandise Corp*., 451 F.Supp. 2d at 1083; *Native American Arts v. Earthdweller, Ltd.*, 2002 WL 1173513, 5 (N.D.Ill. 2002). In the instant case, there is no such testimony, however tenuous. If such testimony were available it would surely have been adduced. *Compare Muhammad v. Oliver*, 547 F.3d 874, 877 (7ᵗʰ Cir. 2008)(Posner, J.)("[I]f there is an executed standstill agreement, one would expect an allegation to that effect. There is none. The complaint's silence is deafening."); Jean Edward Smith, John Marshall: Definer of a Nation (1996) ("More than five weeks have elapsed since the Supreme Court declared the necessity of proving the fact, if it exists. Why is it not proved? Chief Justice Marshall said he could not assume that the government was remiss in seeking the proof; the only conclusion was that the evidence did not exist.").

of the allegations in the Complaint, [*See e.g.,* Dkt. # 1, ¶¶ 24-28], and allegations are insufficient to withstand a summary judgment motion and establish Article III standing.[11]

Certainly, affidavits and declarations are properly a part of a record on summary judgment motion under Fed.R.Civ.P. But, "[t]he object of [the rule] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990). *See also Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529, 539 (7th Cir. 2011); *SMS Demag Aktiengesellschaft v. Material Sciences Corp.*, 565 F.3d 365, 371 (7th Cir. 2009). Summary judgment is "put up or shut up" time – the time for the non-moving party to come forward with admissible evidence to prove its case. *Olendzki v. Rossi*, 765 F.3d 742, 749 (7th Cir. 2014); *Goodman v. National Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

In ruling on Stone's motion to dismiss early on in this case, Judge Darrah gave NAA a not so subtle warning about what might lie ahead:

> While NAA does not point to any particular sale injuries or lost sales figures, it is important to note *at the motion to dismiss stage* that the burden on the complaining party is no greater than that required to give the defendant notice as to the crux of the case. . . . While the facts surrounding the validity of NAA's injury are unclear (and may even end up being adjudged altogether illusory), it is clear that NAA has properly pled its case to establish its standing.

*Native American Arts, Inc. v. Peter Stone Co., U.S.A., Inc.*, 2009 WL 1181483, 2 (N.D.Ill. 2009)(Emphasis supplied). This was not the first time that NAA had been warned about the consequences of failing to adduce proof in support of its conclusory and sketchy Complaints. *See*

---

[11] As drafted, the Complaint would authorize suit against anyone who, anywhere in the country, sold merchandise in violation of the Act. But that would allow the very multiplicity of suits the injury in fact requirement is designed to prevent, *American Bottom Conservancy,* 650 F.3d at 655.

*e,g., Native American Arts, Inc. v. Specialty Merchandise Corp.*, 451 F.Supp.2d 1080, 1083 (C.D.Cal.2006)("If NAA fails to adduce sufficient evidence of competition, it may suffer defeat at summary judgment. ... Article III of the United States Constitution requires proof of such damages in order to have access to the federal courts to establish and collect upon such a claim. Plaintiff must bear in mind that it shoulders the burden of proof on this issue, and this Court is required to jealously guard its own jurisdictional boundaries."); *Contract Specialties, Inc.*, 754 F.Supp.2d at 390 ("If NAA fails to adduce sufficient evidence of competition, it may suffer defeat at summary judgment. At this stage of litigation, however, it is enough for NAA to allege that it sells similar products as Specialties and that its sales and reputation are harmed by Specialties' false advertising and sales of fakes.").

But now, six years after NAA filed the Complaint in this case, it still has nothing more than its unsupported claims. And that is insufficient. *Barlass v. City of Janesville, Wis.*, 483 Fed.Appx. 261, 266 (7th Cir. 2012)("While [plaintiff] successfully established Article III standing at the pleading stage by broadly alleging that the heightened police scrutiny was "very damaging" to her personally, annoyed her patrons, and caused her to lose revenue, at summary judgment she was required to provide "specific facts" in order to maintain that standing."); *Indio*, *supra*. *Compare Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 181 (2014)(plaintiffs submitted proof of concrete, personal injuries that were fairly traceable to defendant).

Even if one goes beyond Mr. Mullen's Declaration, review of his deposition testimony shows that he has nothing more than a belief that companies *like* Stone hurt Indian arts and crafts organizations *like* NAA. He has no evidence of anything concrete or particularized and no evidence to trace whatever injury he "believes" he has suffered by *Stone's* activities. And that's fatal for NAA's lawsuit because mere speculation or conjecture is not enough to establish an injury in fact.

18

Evidence is required. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *American Bottom Conservancy*, 650 F.3d at 656 ("plaintiff's current members presented uncontroverted evidence" of harm if the existing wetlands are destroyed"); *Bowden v. Kirkland & Ellis LLP*, 432 Fed.Appx. 596, 600 (7th Cir. 2011)*; Wisconsin Right to Life, Inc. v. Schober*, 366 F.3d 485, 489 (7th Cir. 2004).[12]

As far as evidence of NAA's lost sales, Mr. Mullen has none. He merely hypothesized that:

it's – seems to me it's common sense that if there are Native American products, if a consumer wants a Native American product, and you have Native American Arts selling Native American products, and you have Peter Stone selling Native American products, which are falsely Native American products, the products that Peter Stone sells is diverting a sale from a company *like* Native American Arts.

[Dkt. # 279-1, ¶ 108; Dkt. # 279-2, at 147 (Mullen Dep., at 98-99)](Emphasis supplied).

But the question is not whether sales were diverted from a company "like" NAA, but whether they were actually diverted from NAA. According to NAA, two of its competitors are customers of Stone. But there is absolutely nothing to show that Stone ever sold those two competitors any products in the Wolfwalker line, and it is speculation to assume that either of the two competitors would have bought from NAA but for Stone's conduct. And, as discussed above, *supra* n. 8, speculation is neither evidence, nor a substitute for proof. *Matthews v. Waukesha County,* 759 F.3d 821, 824 (7th Cir. 2014)("'we have explained that the nonmoving party 'must do more than raise some metaphysical doubt as to the material facts; [it] must come forward with specific facts showing that there is a genuine issue for trial.'").

---

[12] Speculation is not proof in any context. *See Ray v. Clements,* 700 F.3d 993, 1017 (7th Cir.2012); *United States. v. Katz,* 582 F.3d 749, 752 (7th Cir. 2009); *In re Cohen*, 507 F.3d 610, 614 (7th Cir.2007); *Louth v. McCollum,* 424 F.3d 631, 634 (7th Cir.2005).

Although, during discovery, NAA claimed it suffered $5000 in actual damages, Mr. Mullen can't say whether NAA lost any sales. As he continued to explain his damage theory at his depositions, he said the sales were diverted, not necessarily from NAA, but from "the industry." (Mullen Dep., at 101). He could get no more specific than to speculate is that the sale "*could* have gone to Native American Arts" and it was "*possible*" that someone who bought from Stone would have bought from NAA. (Mullen Dep., at 103). NAA points to no sales records or any figures of any kind or evidence anywhere in the record. In fact, the genesis of the $5000 "competitive damage" figure is shrouded in mystery, and that is a bit concerning since Rule 11 requires a pre-filing inquiry of the facts and Rule 26(a)(1) requires early on a computation of damages and an explanation of how the damages were computed. Rule 26(a)(1)(A)(iii), requires that a party seeking damages must also "make available for inspection and copying as under Rule 34 the documents or other evidentiary material ... on which each computation is based." *See Design Strategy, Inc. v. Davis,* 469 F.3d 284, 295 (2d Cir.2006). Rule 26(e)(1) requires parties to supplement their initial disclosures in a timely manner if the party learns that they are incomplete or incorrect. *See, generally, Dynegy Marketing and Trade v. Multiut Corp.*, 648 F.3d 506, 514 (7th Cir.2011).

In the instant case, the plaintiff's Rule 26(a) disclosures did not comport with these requirements. While claiming that it suffered competitive injuries of $5,000, from the defendant's sale of "violative Indian products in competition with [plaintiff's] authentic Indian products," no explanation was made beyond the conclusory statement that the defendant's products "drove down prices of authentic Indian products, forcing [plaintiff] to offer its authentic products at lower prices," and that in addition to lost sales the plaintiff has "suffered a loss of good will and reputation...." [Dkt. #295-2 at ¶79). And this statement came in the midst of the summary judgment briefing. *Id.* No

evidence was offered to support the conclusory statement.

Mr. Mullen's pattern appears to be not to gather evidence of damages prior to filing his complaints. In *Specialty Merchandise Corp.*, NAA's counsel admitted that plaintiff had conducted no investigation from which it could reasonably conclude that it has been injured by defendants' conduct. In fact, he admitted that he had spoken to no person who could document any actual injury. The district court held this was a violation of Rule 11 of the Federal Rules of Civil Procedure, saying:

> When a defendant challenges the court's subject-matter jurisdiction over a plaintiff's claim, a plaintiff must "present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction." ... This burden is not satisfied by counsel's vague reference to what expert testimony might, at some unspecified time in the future, reveal. Therefore, it is evident to the Court that an attempt by plaintiff to amend the Complaint to establish standing at this time would be futile, and therefore, the Court does not grant leave to amend the Complaint. 451F.Supp. 2d at 1083.

At his deposition in this case, when asked how he came up with the claim that NAA suffered $5000 in estimated damages, Mr. Mullen said he "believe[d] the figure came from conversations that [he] had with his attorney." [Dkt. #279-1, ¶ 62; Mullen Dep., at 145]. When he was asked whether he consulted any invoices or records to come up with that figure, his counsel *improperly* objected and instructed Mr. Mullen to invoke the attorney-client privilege and not answer that question. (Mullen Dep., at 145-47). Apart from the waiver resulting from answering the question without claiming privilege at that point, the answer to the question of whether Mr. Mullen reviewed any business records to come up with a damage figure obviously is not privileged, and the instruction not to answer could not have been more purposefully obstructive and wrong. *See* Rule 30(c)(1) and (2), Federal Rules of Civil Procedure*; Redwood v. Dobson*, 476 F.3d 462, 468 (7th Cir. 2007); *Flowers v. Owens,* 274 F.R.D. 218, 222 (N.D.Ill.2011) (improper to instruct deponent not to answer the question of

whether he had called an eye doctor to find out how much it would cost for one appointment"); *Specht v. Google, Inc.*, 268 F.R.D. 596, 598 (N.D.Ill. 2010).

The attorney-client privilege protects only communications; it does not protect the underlying facts communicated to counsel if otherwise discoverable. *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981). The issue here is not NAA's counsel's professional assessment of the amount of damages or whether NAA suffered an injury in fact, such as the claimed sales NAA alleges it lost and the amount of damage suffered by purportedly having to sell its merchandise at a reduced price. Either NAA has proof of that or comparable injury or not. Either its owner consulted records or conducted some independent inquiry to determine whether NAA had lost sales or he didn't. The question to Mr. Mullen did not call for disclosure of a privileged communication any more than had Mr. Mullen been asked to say whether he took a cab to the deposition or what he had for breakfast – even if his attorney joined him and had the same thing.

In the end, it is beyond debate that NAA has offered not a particle of proof of lost sales or lost profits or any other form of injury in fact caused by the actions of the defendant. By hiding behind a faulty claim of privilege, NAA has ceded the lost sales issue to Stone.

### E.

As for the claim that Stone's activity forced NAA to lower its prices, NAA, again, has no evidence. On this point, the best Mr. Mullen could say was:

> I can't exactly say that, you know, we lowered a penny because of this reason or a penny because of that reason, but I can tell you this: I *believe* that because of normal retail markup in the retail industry, we cannot markup these products in a normal retail environment like most products are, and that's due to the falsely suggestive imitative products just *like* Peter Stone is selling.

(Mullen Dep., at 108)(Emphasis supplied). But Mr. Mullen's "belief" he couldn't mark up his product

is proof only of his own belief, the sincerity of which is not an issue in this case. "While [Mullen may believe with all his heart what he said at his deposition] subjective beliefs of the plaintiff ... are insufficient to create a genuine issue of material fact." *McMillian v. Svetanoff,* 878 F.2d 186, 190 (7th Cir.1989). *Accord, Fairchild v. Forma Scientific, Inc.,* 147 F.3d 567, 574 (7th Cir.1998); *Schatz v. McCaughtry,* 1996 WL 326015, 3 (7th Cir.1996).

Moreover, his lawsuit is not about products "just like" those Stone sells. Stone is the defendant NAA chose to sue, and the case must be confined to an injury *in fact*– if any – fairly traceable to *Stone's* products. Mr. Mullen could point to absolutely no evidence, other than his belief and opinion (Mullen Dep., at 116), that he could not mark up is products due to Stone's activities. Similarly, he had no proof that he had lowered his prices, and he could not trace any believed price lowering to the time period at issue here. He could only say it was "an ongoing problem for many, many years . . . ." (Mullen Dep., at 117-18)(Emphasis supplied). Stone's activities, on the other hand, were not ongoing for many, many years.

NAA has no evidence regarding advertising. As already noted, NAA spends a relatively small amount on advertising. There is absolutely no proof to suggest that it was forced to increase this outlay in 2006-2009, whether as a result of Stone's activities or otherwise. NAA offers nothing more than Mr. Mullen's unsupported claim that "[t]o counteract the damage that Counterfeiters *like* Peter Stone have done to the value of the "Authentic Native American" designation of origin, NAA has made efforts to bolster the value of the designation through additional advertising and additional efforts to educate the public . . . ." (Mullen Dec., at ¶ 88)(emphasis supplied)).

But, it bears repeating, the question is not whether an injury in fact can be traced to companies

"like" Stone, but whether it can fairly be traced to Stone. And the assertions regarding advertising that Mr. Mullen makes show that he was undertaking the same efforts before the Wolfwalker collection came along as when the collection was for sale. (Mullen Dec., ¶ 20 (2004); ¶ 26 (1999); ¶28 (since 1999); ¶29 (since 1996); ¶33 (from 1996); ¶34 (from the last 18 years)).[13] NAA, through Mr. Mullen, had to concede that he had no evidence, other than the allegations of his complaint and the manner in which Stone advertised its products, that NAA suffered any injury at all due to Stone's activities. (Mullen Dep., at 126-27). The mere fact that someone falsely designates a product as Native American does not imbue NAA – or any other Indian Arts and Crafts organization – with Article III standing without proof of a concrete injury in fact, fairly traceable to the company being sued.

Relying on *Armes v. Sogro, Inc.*, 932 F.Supp.2d 931 (E.D.Wis. 2013), a Fair and Accurate Credit Transactions Act ("FACTA") case, NAA submits that it has Article III standing to sue for no other reason that the fact that Congress enacted a statute making it a violation to pass off non-authentic Indian arts and crafts as authentic. The plaintiff in *Sogro* stayed at the defendant's motel and, when he paid by credit card, the motel gave him a printed receipt showing his entire credit card number and its expiration date, in violation of the Act. The defendant argued that the plaintiff had no standing to sue the motel owner because he suffered no harm – no identity theft or inconvenience – as a result of the receipt. *Id.* at 937. The court, relying on *Lujan*, 504 U.S. at 578, held that there

---

[13] NAA submits examples of its advertising efforts in its Exhibit 28, but there is no indication on many of these materials of when they were published. (Pl. Ex. 28). Of the few that are dated, there is nothing to indicate that more was spent as a result of Stone's activities in 2006-2009 (Ex. 28-F, 28-G, 28-H, 28-I (all from 2009)), than was spent prior to the Wolfwalker collection going on sale. (Ex. 28-D (1998), 28-J (1997), 28-N (2001), 28-O (2001), 28-Q (2002)). There is also no significant difference in the ads, before Wolfwalker and after, NAA touts "Authentic Native American Products."

was standing to sue "'solely by virtue of [FACTA] creating legal rights, the invasion of which creates standing.'" *Id.* at 937.

The differences between *Sogro* and this case are clear. The defendant in *Sogro* violated FACTA by actually putting the *plaintiff's* credit card information at risk. That was the prohibited conduct; no further consequential harm was required to make out a case under the statute. But the statute here has very different components. Under NAA's attempt to equate FACTA and the IACA, it would have standing to sue whenever a retailer anywhere issues a violative receipt because NAA is also a credit card holder. To Mr. Mullen's way of thinking, there would be an Article III injury to all credit card holders *like* him whenever any retailer *like* the defendant issues a receipt with the prohibited information on it simply because there is a violation of a statutory right Congress created. "But the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Sierra Club v. Morton*, 405 U.S. 727, 734-735 (1972). Mr. Sogro obviously was. On this record, NAA was not.

NAA goes so far as to equate itself with a fair housing tester, who seeks housing without really being interested in it as a stalking horse to uncover violations of the law. But when such a person is denied fair housing they have been denied a right, whether they wanted to exercise it fully or not, by conduct easily traceable to the entity they are applying to. The tester's uncommunicated motivation is irrelevant. NAA has no evidence that it suffered any injury, and cannot trace any injury to Stone. NAA's situation is simply not analogous to the tester.

A more analogous hypothetical might go this way: Suppose Congress enacted legislation that required real estate developers to contract a certain portion of their business on every project to minority- or female-owned subcontractors, even if those firms' bids were not competitive with those

of other firms. The thinking behind the law would be that older, established, white male-owned firms have over time developed the resources and efficiencies to bid jobs at much lower rates, while minority- and female-owned firms have not and will not be able to until they are regularly part of the monetary pie. Now suppose a real estate development firm in Seattle decides that the costs of using the protected firms in lieu of the less expensive firms is too great and they refuse to provide the mandated set asides, thereby violating the act.

A woman who owns a construction firm in Chicago that only operates in Chicago and does no work or bid for jobs in the Seattle market has no standing to sue the Seattle company. It does not matter that the Seattle company's activity could have a ripple effect with other companies following suit to remain cost-competitive, or that it is engaging in conduct that harms other individuals like the woman in Chicago. The woman in Chicago, even though she is exactly the type of person Congress wants to protect, and the Seattle company is violating the right Congress created for people like her, cannot point to an "injury in fact," traceable to the Seattle company; the statutory violation has not affected her in any personalized and individual way that she can point to – and to which she must be able to point.

Along the way, NAA confuses Article III injury in fact with the amount of damages incurred, pointing out that many cases find that nominal damages or intangible economic injury can give rise to Article III standing. That may be true, but whether damages are nominal or substantial, there still must be a concrete, personal injury in fact that is fairly traceable to the defendant. In each of three cases that NAA cites, even though the plaintiff might have suffered nominal economic or intangible injury, each was still able to show that it had suffered an Article III injury in fact that was fairly traceable to the defendant's actions.

And so, in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 262 ( 1977), the plaintiff, a non-profit real estate developer seeking to build low income housing, had standing to sue the defendant village when it refused to rezone the tract of land in question for multi-family housing. The Court readily found that the plaintiff had suffered a substantial economic injury, having expended thousands of dollars in planning and preparation for the project. But, more germane to NAA's point, the Court also found that standing was not dependent solely on economic injuries. The village's zoning decision had blocked the plaintiff's "specific project": establishing affordable housing in areas where it was scarce. 429 U.S. at 262-63. Accordingly, there was a concrete injury, personal to the plaintiff, easily traceable to the defendant. NAA, speaking through Mr. Mullen, points to nothing remotely like that here, talking instead of injuries to organizations "like" NAA, "potentially" caused by companies "like" Stone.

In *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167 (7th Cir. 2000), the plaintiffs sued the defendant due to mercury discharges that violated the Clean Water Act. One plaintiff testified that he could no longer fish in the affected river due to the runoffs. Another testified she no longer waded in the river or picnicked on the shore. Plaintiff after plaintiff testified specifically how the defendants activities has adversely affected their enjoyment of the area. 528 U.S. at 181. All this was clearly traceable to the defendant; defendant was responsible for the pollution. And although intangible, the injuries were concrete and personal. Mr. Mullen's theory of injury in fact is akin to a plaintiff in *Laidlaw* testifying that when companies *like* Laidlaw spoil a river with pollutants, people *like* him no longer are able to enjoy the river, but being unable to say whether the pollution affected any decisions he made about his own enjoyment of the area – or whether he was a person who in fact was among those who actually utilized and enjoyed the river.

Finally, in *Trewhella v. City of Lake Geneva, Wis.*, 249 F.Supp.2d 1057 (E.D.Wis. 2003), abortion protestors had standing to challenge a city ordinance requiring a parade permit because they suffered a chilling effect – an intangible injury – on the exercise of their First Amendment rights that was easily traceable to actions taken by the city, namely enacting the inhibiting ordinance. *Id.* at 1068. As for the concreteness of this injury, the court held that it was well-settled that an ordinance that arguably covered the conduct in question automatically gave rise to a chilling effect injury in terms of standing. *Id.* There is no such caselaw at work here, and there is no discernible thread to trace any injury NAA might have suffered to the Wolfwalker line.

NAA also throws in an argument that it has standing because it suffered a reputational injury, *a la* a Lanham Act plaintiff, citing *Lexmark Intern., Inc. v. Static Control Components, Inc.*, _U.S._, 134 S.Ct. 1377 (2014). There, the court held that "a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." 134 S.Ct. at 1391.[14] NAA has shown nothing of the kind. There is no evidence of any customer withholding trade from NAA as a result of Stone's activities. Stone has only two customers that NAA even claims to be its competitors, and there is no evidence that any Wolfwalker products

---

[14] *Lexmark's* discussion of reputational injury was not part of an inquiry into Article III, traceable-injury-in-fact standing, but part of an analysis of whether certain types of plaintiffs were within the class of those that had a right to sue – "statutory standing." 134 S.Ct. at 1388-94; *see Retirement Bd. of the Policemen's Annuity and Ben. Fund of the City of Chicago v. Bank of New York Mellon,* 2014 WL 7272269, 4 n.5 (2nd Cir. 2014)(*Lexmark* "clarified that 'statutory standing' involves the scope of the cause of action authorized by Congress and is not an element of standing under Article III."). It has already been determined that, as an Indian Arts and Crafts Organization, NAA is within the class with a right to sue under IACA. Whether it has shown an injury in fact personal to it and fairly traceable to Stone's activities is another matter. Also, it should not be disregarded that *Lexmark* was decided at the motion to dismiss stage, where allegations were sufficient, and proof was not yet necessary. This case is long past that stage, and summary judgment is the time for proof.

ever made their way to those stores. Indeed, NAA and Mr. Mullen do not even hazard such a claim, even though NAA could easily have found out in discovery whether there had been such sales. Nor has NAA advanced any evidence of a Lanham Act-style reputational injury. And, on this point, NAA again confuses proof of actual damages with Article III's requirement of an injury in fact. While it may require effort to prove a monetary amount attached to an injury to reputation, an injury in fact, personal to NAA and traceable to the Stone, still must be proved.

The plaintiff in an IACA case, no less than in any other, *must* demonstrate that it has suffered a concrete injury in fact, personal to it, and fairly traceable to the activities of the defendants. Just as in *Indio*, NAA's assertions regarding Article III standing lack any evidentiary support, and it has failed to establish that it has Article III standing to sue Stone. Summary judgment must therefore be entered in the defendant's favor.[15]

If standing could be based on nothing more than the types of ethereal assertions Mr. Mullen makes about injuries "like" this being due to companies "like" that, the results would be beyond anything Congress imagined or intended. Yet, we know the "[t]he soundness of a conclusion may not infrequently be tested by its consequences," Posner, Cardozo: A Study in Reputation, 118 (1990), and an argument may be "scotched" where its acceptance would produce "outlandish consequences." *United States v. Cinergy, Corp.*, 458 F.3d 705, 709 (7th Cir.2006).[16] Acceptance of Mr. Mullen's

---

[15] Oddly, NAA contends that Judge Kocoras undertook no Article III standing analysis and, instead, confined his holding to determining that NAA had no standing because there had been no violation of the IACA. [Dkt. # 279, at 13-16]. NAA ignores pages 8-11 of Judge Kocoras's Opinion, in which he embarks on the same type of Article III analysis performed here and concludes that NAA failed to show an injury in fact traceable to Indio. [Dkt. # 249-19, at 8-11].

[16] *See also University of Pennsylvania v. E.E.O.C.*, 493 U.S. 182, 194 (1990); *Florida Power & Light Co. v. United States Nuclear Regulatory Commission*, 470 U.S. 729, 741 (1985).("An examination of the consequences that would follow upon adoption of the contrary rule proposed by the Court of Appeals in

(continued...)

theory would mean some 6 million people and entities would have standing to sue Stone – resulting in the very multiplicity of suits that the injury-in-fact requirement seeks to prevent. *American Bottom Conservancy,* 650 F.3d at 656. Without that requirement, the courts would be "overwhelmed" by suits brought by those only "trivially or not at all harmed by the wrong complained of." *Id.*

NAA tells us that there are 345 Indian arts and crafts organizations listed in the Indian Arts and Craft Board's registry [Dkt. # 279, at 6], all of which, under NAA's theory, would have standing to sue Stone. That would be nearly $5 billion in statutory damages. Then, there are the 556 federally-recognized Indian Tribes, all of which also would have standing to sue Stone as well under NAA's theory. That would be an additional $8 billion in damages. And each of the over 5 million individual Indians in the country would also have standing to sue Stone according to NAA's theory. That would be millions of lawsuits with a potential $70 trillion in damages, as a result of $27,000 in sales.[17]

The *entire* Indian arts and crafts industry, legitimate and illegitimate, is worth, at the most, just $1 billion annually – at least that was the estimate several years ago. H.R. Rep. No. 101–400(I), at 4–5 (1990), 1990 U.S.C.C.A.N. 6382, 6383–84 (citing a 1985 Commerce Department report to Congress that "estimated that unmarked import imitations of Indian arts and crafts are siphoning off 10 to 20 percent of the market for genuine handicrafts produced domestically," then worth an annual $400–$800 million); S. Rep. No. 106–452, at 1 (2000) (citing estimates that in the one-billion-dollar

---

[16](...continued)
these cases confirms the soundness of this conclusion"); *Parents Involved in Community Schools v. Seattle School Dist. No. 1,* 551 U.S. 701, 858 (2007)(Breyer, J., dissenting)("Hence it is important to consider the potential consequences of the plurality's approach, as measured against the Constitution's objectives."); *Curia v. Nelson,* 587 F.3d 824, 831-832 (7th Cir.2009))(consequences important in contractual construction); *Alliance to End Repression v. City of Chicago,* 742 F.2d 1007, 1010-1011 (7th Cir. 1986)(same).

[17] There are a little over 5 million Native Americans in the United States. http://www.census.gov/ prod/cen2010/ briefs/c2010br-10.pdf.

market for Indian goods, $400–500 million of demand was being satisfied from non-Indian sources). For NAA and Mr. Mullen, Stone's $27,000 in sales puts it on the hook for 70,000 years of the entire output of the industry. Congress' desire to deter sales of counterfeit Indian products and preserve an important aspect of the Nation's American culture was not intended to nor could it authorize so grossly punitive and excessive a result. Nor do fundamental concepts of standing allow it.

## CONCLUSION

The plaintiff has failed to show that there is a genuine issue of material fact on the question of Article III standing and thus the defendant's motion for summary judgment is granted. Since the plaintiff has not established standing to sue under Article III of the Constitution, the suit does not invoke the district court's jurisdiction and is thus dismissed without prejudice.

ENTERED: _____
                      **UNITED STATES MAGISTRATE JUDGE**

**DATE:** 6/9/15